SAMUEL CHEW, EX'R OF
REBECCA GIBSON
vs.
THE PRESIDENT, DIRECTORS
AND COMPANY OF THE
FARMERS' BANK OF MARY-
LAND ET AL.

DECEMBER TERM, 1848.

[PRIVILEGED COMMUNICATIONS—ANNUITY TO A WIDOW IN LIEU OF DOWER A
CHARGE UPON LANDS—LIMITATIONS—LAPSE OF TIME—STALE DEMANDS.]

THE rule that communications which a client makes to his legal adviser for the purpose of professional advice or aid, shall not be disclosed, stands upon such firm grounds of public policy, and is so well fortified by authority, that it would be impossible to contest it.

Upon every such communication, made by a party to his counsel, attorney, or solicitor, the seal of the law is placed and remains forever, unless removed by the party himself, for whose protection the rule was established.

Communications made by a client to a witness in relation to the provisions of her will, in the drawing of which the witness was acting as her attorney, the reasons assigned for such provisions, and the conversations that took place upon that subject, fall clearly within the rule, and must not be disclosed.

But, a witness must disclose any information, pertinent to the cause, which has no necessary connection with his professional character, and which he did not acquire by reason of the confidence reposed in him on account of that character.

When a witness makes objection to a question on this ground, he must be understood as making it in behalf of the client ; and, therefore, when the client, or the party representing him, stands by, and does not release the witness from the obligation not to reveal the information, he must be understood to approve of the objection, and to insist upon his privilege.

The proper way to bring the question of privileged communications before a court of equity, is for the witness, when he declines answering the interrogatory,

to state his objection before the commissioners, who return the commission with what is called the witness' demurrer, and the question is then set down for argument.

A testator bequeathed to his wife $500, annually, whilst she remained his widow, "to be paid to her by his two sons, E. and F., by them and their heirs jointly, $250 by each ; but, in case his widow should marry, they were to pay her only one-half of that sum equally between them ;" and declared the said bequest to be in lieu of, and in full satisfaction for, his wife's dower in his real and her thirds of his personal estate.   To his said sons, E. and F., he devised large portions of his real property.   The widow elected to abide by the provisions of the will.   HELD—

That, since the case of *Crawford* vs. *Severson, 5 Gill,* 443, it would be difficult to maintain, that this bequest was not a charge upon the lands devised to E. and F., the parties by whom it was to be paid : yet, this being an annuity of uncertain duration, there may be reasons which would influence the court not to treat it as a charge, which would not apply to a legacy or other claim which could be at once paid off.

There can be no doubt, that though the lands may be charged with this annuity, the devisees, E. and F., are also personally responsible for its payment.

The position that this annuity, being in lieu of dower, is, like the claim for dower, exempt from the statute of limitations, may be sound, though the consequences might be oppressive, so far as the defendants are concerned, who would have to bear the whole weight of the accumulated claim ; whereas, if the claim for dower were asserted, all the devisees of the testator would have to contribute in proportion to their several devises.

The right of the widow to this annuity commenced in 1818, and some of the lands supposed to be charged with its payment were purchased by the defendants in 1821 ; yet, the claim is not asserted until the year 1846, twenty-eight years after the accrual of her title, and twenty-five years from the accrual of the adverse title of the defendants.   In the meantime, various transfers of this property had been made, and innocent parties had purchased in ignorance of the claim now set up, and with the full knowledge of the complainant, who, for all this time, neglected to assert her claim, and E. and F., the devisees of the land, who had sold it, with covenants to convey unincumbered titles, had died insolvent : it was HELD—

That these circumstances were sufficient to outweigh the equity of the complainant's claim, strong as that equity would be, under other circumstances, to the favorable consideration of the court : and that she had neglected, for an unreasonable length of time, to assert her claim, and, therefore had no title to call for the active interposition of a court of equity in her favor.

A court of equity, which is never active in granting relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights for a great length of time ; nothing can call forth this court into activity but conscience, good faith and reasonable diligence.

From the earliest ages, courts of equity have refused their aid to those who have neglected, for an unreasonable length of time, to assert their claims, especially where the legal estate has been transferred to purchasers without notice.

If claims which have slept for upwards of twenty years, can be thus revived, when the estate upon which they are supposed to rest has passed into other hands, the title to property would never be secure.

There can be no doubt that a widow, with respect to a devise made to her in lieu of dower, is to be considered as a purchaser, with a fair consideration; but if the provision made for the wife by the will is fraudulent, in being greater than her common law rights, and, therefore, unjust and injurious to creditors—to the extent of such excess, her title would not prevail against the claims of creditors.

Where a husband, in his lifetime, gives to one of his creditors, a mortgage upon a particular portion of his estate, to secure the claim of that creditor, he cannot afterwards take away that security by charging in his will that same part of his estate, with the provision for his wife, even though that provision, in view of his whole estate, does not exceed her common law rights. The most the wife could claim, under such circumstances, would be to the extent of her dower interest in the particular land mortgaged, and for the amount of the provision beyond this, she must be regarded as a volunteer, and her claim for such excess, subordinate to the claim of the creditor.

———

[Jacob Gibson, late of Talbot county, deceased, died in January, 1818, seized and possessed of large and valuable real estate, leaving a widow, Rebecca Gibson, entitled to dower therein, and leaving also, a last will and testament, duly executed on the 29th of November, 1817, which was regularly admitted to probate by the Orphans' Court of said county, on the 13th of January, 1818. In this will, after sundry devises to his several children, and particularly of real estate to his sons, Edward R. and Fayette Gibson, the testator devised to the said Rebecca, during her widowhood, "the use, occupation and enjoyment of one moiety or half-part of his dwelling house, or one half-part or moiety of the dwelling house bequeathed to his son Fayette, which he purchased of the Hughes, and lying in Miles River Neck; and also one-half of the use of the kitchen, garden and out-houses, belonging to either of the aforesaid farms or plantations, whichever she might choose, at any time, to live at, during her widowhood aforesaid." He also directed "his sons, Edward R. Gibson and Fayette Gibson, their heirs and assigns, to furnish the said Rebecca with sufficient firewood off the lands bequeathed them, so long as she might remain in either of the houses aforesaid: the wood to be cut and delivered to her door, prepared for her use as fuel generally

21*

is." He also gave to the said Rebecca, sundry negroes for life, and various articles of personal property, including "two horses and two cows, with the privilege of pasturage for them, on the plantation she might, from time to time, choose to reside at, with the use of the stables and provender of all kinds for them during the year or years she may live." In a subsequent clause, he gave and bequeathed to the said Rebecca, $500 annually, whilst she remained his widow, to be paid to her by his two sons, Edward R. Gibson and Fayette Gibson, by them, or their heirs jointly, $250, by each of them; but, if she should marry, they were to pay her only one-half of that sum equally between them." The testator then declared the foregoing bequest and devise to his wife, "to be in lieu of, and in full satisfaction for her dower in his lands and real estate, and her thirds of his personal estate, and remainder of both his real and personal estate not before devised or disposed of."

Rebecca Gibson, the widow, accepted the provisions of the will in her favor, in lieu of her dower, and Edward R. and Fayette Gibson entered into possession of the real estate devised to them respectively, and particularly described therein. Fayette, in 1821, sold his portion of the estate, known as "Marengo," to Edward Lloyd, by whom it was subsequently devised to his son, Edward Lloyd, the defendant, and the estate known as "Lombardy," to one John Wilson Blake, after whose death it was again sold, and subsequently one portion thereof came into possession of James Hopkins, and the residue was held and owned by Charlotte L. Edmondson, as tenant for life, with remainder to Horatio L. Edmondson. Edward R. Gibson sold the estate devised to him, being part of "Marengo," to Fayette, in whose possession it continued up to the 29th of March, 1839, when it was purchased by the Farmers' Bank of Maryland, under a decree of the Court of Chancery, in the case of McCormick vs. Gibson, for the sale of the real estate of Jacob Gibson, for the payment of his debts, his personal estate having proved insufficient for that purpose, at the sum of $10,500. About the same time the bank leased the same to Fayette Gibson, who, under said lease, remained in possession until his death, and on the 1st of January, 1841, the bank also

sold a portion of its purchase to Kennedy R. Owen, who entered into possession of the same.

On the 10th of June, 1846, Rebecca Gibson, the widow, filed her bill against all the parties just named, as in possession of, or claiming title to, the estates devised to the said Edward R. and Fayette, setting forth the facts aforesaid; averring that she had continued, ever since the death of her husband, Jacob Gibson, unmarried, and his widow; claiming the benefit of the bequests and devises in her favor, as liens upon the said estates, averring them to have been, and to be, far less in value than her dower interest, and that by her acceptance thereof, all persons interested in the estate of the said Jacob, had been greatly benefited; alleging that no part of the said $500 had at any time been paid to her by the said Edward or Fayette, or any or either of their assignees, or by the said bank, but that the same, with interest from year to year, amounting on the first of February preceding, to the sum of $24,140, was still due and unpaid, and admitting that she had lived, and was then living with her son, Fayette, on the estate devised to the said Edward Gibson, but charging that her board had not been equal in value to the privileges, to which, during that period she had been entitled, but had abstained from claiming, or had not received.

The bill further claimed, that by not renouncing the said will, she became a purchaser for a fair consideration, of the several devises to her, and charges that if the said devises be not a trust in her favor, binding upon the said estates, there has been an utter failure of such consideration, and she is, therefore, entitled to dower in said lands, and damages for the rents and profits due to her from the death of her husband : that Edward R. Gibson acted as the executor of said Jacob Gibson, the other executors having renounced, but that he has since departed this life insolvent, and entirely without assets, and that neither upon his estate, nor upon that of the said Jacob, have letters of administration been since taken out; that the insufficiency of the personal estate of the said Jacob Gibson, was fully shown in the case of *McCormick* vs. *Gibson et al.*, above

referred to, wherein all the parties to this suit, or those under whom they claim, were defendants, and that the decree for the sale of said Gibson's real estate, under which the said bank purchased, expressly reserved the rights of the said Rebecca, and required such sale to be made subject thereto : that the said Edward R. Gibson possessed no means or property, out of which the said charge of $500 a year could have been paid, other than that part of "Marengo," devised to him as aforesaid, and afterwards sold to the said Fayette : and that after the purchase aforesaid, by the bank, the said Fayette, as well as the said Edward, was entirely without means, and utterly unable to pay said annual charges, the proceeds of the sales of his estate having been applied to the payment of the debts of the said Jacob: and concludes by praying a sale, subject to said Rebecca's habitation right, and the privileges connected therewith, of the estates devised to said Edward R. and Fayette Gibson, for the payment of the said charge of $500 a year, and all arrearages thereon, with interest, and asking that the residue of the proceeds of sale may be set apart and invested in such manner as to pay to the said Rebecca, the said sum of $500 annually, during her widowhood.

The answers of Edward Lloyd, the Bank, Kennedy R. Owen, and Horatio L. Edmondson, all insist, that the provisions of the will of Jacob Gibson in favor of his wife, constituted no lien upon the estates devised to Edward R. and Fayette Gibson, but a mere personal charge upon these devisees ; that, by accepting these devises and actually receiving and enjoying the benefit of the provisions contained therein, she renounced all claim to dower, if any she ever had, and has precluded herself from reinstatement to any such right ; the Bank, Owen, and Edmondson also insisting, that if she can claim dower in any part of her husband's estate, she has failed to make the necessary and proper parties to her bill, and to tender herself ready to account for and refund the value of the various privileges enjoyed by her, and of the annuity paid to her, as she should have done ; that Edward R. and Fayette Gibson, paid to Rebecca Gibson the annuity of $500, as it become due, and

supplied all the privileges to which she was entitled, or paid her a full equivalent therefor, and that she had executed to them full acquittances and releases, which enure to the benefit of all said respondents; that they, or those under whom they claim, were purchasers for a full and valuable consideration without notice; Lloyd and Edmondson claiming that the purchase money for the lands held by them, was applied, in whole or in part, to the payment of the debts of Jacob Gibson, deceased, and the said defendants, other than Lloyd, insisting that by the laches of Rebecca Gibson, they have lost the remedy, which they otherwise would have had against Edward R. and Fayette Gibson, by virtue of the general warranty in the deed from Edward to Fayette, under whom the Bank and Owen claim, and in that from Fayette to John W. Blake, under whom Edmondson claims, the said Fayette having become utterly insolvent, and the said Edward having died in like condition and entirely without assets; all these answers assert that no claim had been set up by Rebecca Gibson, until the filing of this bill, and rely upon gross neglect, and laches, lapse of time, and limitations, as full and complete defences thereto.

After the answer of Edmondson, the bill was amended by making Hopkins, the owner of the residue of the land sold by Fayette Gibson to Blake, a party. Said Hopkins, then filed his answer, claiming to be a purchaser for a valuable consideration, without notice, and relying upon the answers of the Bank, Owen, and Edmondson, and adopting them as his own. At the July term, 1847, after the general replication had been entered, and commissions-in-chief had been issued to Talbot and Anne Arundel counties, the death of the complainant, Rebecca Gibson, was suggested, and upon proper proceedings for that purpose, Samuel Chew, her executor, was admitted complainant in her stead, and the cause revived.

The will of Rebecca Gibson, which was filed in the cause, was duly executed on the 4th of August, 1846, and admitted to probate according to law. By it, after bequeathing to one of her grand-daughters, a negro woman and two children, the testatrix authorizes her executor to compromise with the de-

fendants to this suit, or others, against whom she may have claims for moneys due to her, under the will of Jacob Gibson, or for rents and profits by reason of the detention of her dower, in case they or any of them, should desire a settlement without awaiting a final decree against them, and particularly desiring him in such event, to settle in a liberal manner with the Edmondsons and Lloyd, and the owner or owners of the lands then occupied by them, formerly belonging to the said Jacob Gibson; and after providing for the payment of the counsel fees, incurred or to be incurred in the prosecution of this suit, devises the residue of her estate, including the moneys to be recovered in said suit, to her executor, Samuel Chew, in trust for the separate use of Mary C. Gibson, wife of Fayette Gibson, during her life, and after her death, for the said Fayette, during his life, and after the death of the said Mary and Fayette, in trust for such of the children of the said Mary and Fayette, and of the said Fayette, as may be living at the death of the survivor, until they shall respectively arrive at age, or until the marriage of the females ; the children of any deceased child to take the place of their parent, and confers certain powers on said trustee, in relation to the management of the said estate. At the December term, 1847, and the March term, 1848, the commissions to Talbot and Anne Arundel counties were returned, with testimony taken under them, the nature of which is sufficiently explained in the opinion of the Chancellor. Among the witnesses examined on the part of the defendants, Edmondson, Hopkins and Lloyd, was Gov. Philip F. Thomas, to whom the following interrogatories, amongst others were propounded.

*4th Interrogatory.* Were you or not sent for by Mrs. Gibson, to prepare her will, sometime previous to her death, and after the filing of the bill in this cause ? If yea, state at what time you were thus called on, and by whom ? and what were the provisions of her said will, in relation to her claims against Edward Lloyd, Horatio L. Edmondson and James Hopkins, or their property purchased of Fayette Gibson ? State, also, what reasons were assigned by her to you, for such provisions in

said will, and generally all the conversation that took place upon this subject. State also, whether or not said will was executed by Mrs. Gibson? and if you know, what has become of it? The witness having answered that he was called upon after the filing of the bill in this cause, to prepare a will for Mrs. Gibson, and did accordingly prepare one agreeably to directions then received from her, demurred and protested against answering further, for the reasons stated in the demurrer, which was filed and returned with the commission as follows:

Philip F. Thomas' *demurrer to the 4th Interrogatory* of the Edmondsons and Lloyd.

The witness further says, in answer to this interrogatory, that all the conversation alluded to in this interrogatory, as having been had between him and Mrs. Rebecca Gibson, was entirely and solely in relation to the will he was about to draw for her, the provisions thereof, and her reasons for the same, during all which time he was, so far as the drawing of the said will was concerned, acting as her attorney. He, therefore, considers it as a confidential communication from her as client, to him as her attorney, and declines stating any thing in relation to the said conversation.

*5th Interrogatory.* Who, if any persons, were present at the time the conversations alluded to in the previous interrogatory, took place? and was there any thing in her conversations not intended to be heard by those present?

*Demurrer to the 5th Interrogatory.*

The said witness declines to answer this interrogatory for the reasons above stated as to the 4th interrogatory.

*7th Interrogatory.* Was, or not, the conversation alluded to in your protest or demurrer, held in the presence and hearing of other persons? If yea, who were the persons present, and, so far as you know, have they or not spoken of it, so as to make it public? and have you or not heard from Fayette Gibson the substance of said conversation?

*Demurrer to the 7th Interrogatory.*

The said witness in answer to this interrogatory, says, that he objects to answering the same, because if answered, he pre-

sumes it is intended, and for aught he knows, may be used either by the testimony of others, or proof of deponent's declarations, to prove the said conversation which he has already objected to declaring. If the conversation can be proved by others, the witness has nothing to do with that proof. If his testimony is to be connected in any way with that of other persons, it would, in his view, be a breach of professional confidence ; and, therefore, as well as for the reasons heretofore stated, he declines to answer this interrogatory.

*8th Interrogatory.* Was or was not the conversation alluded to in your first protest or demurrer, held in the presence and hearing of other persons ? If yea, who were the persons present ?

*Demurrer to the 8th Interrogatory.*

The said witness declines to answer this interrogatory for the reasons stated in his demurrer to the 7th interrogatory.

These demurrers were set down for hearing, and after argument by counsel, the following opinion was delivered, and order passed, by the Chancellor, on the 10th of November, 1848.]

THE CHANCELLOR :

The application of the admitted rule, that communications which a client makes to his legal adviser for the purpose of professional advice or aid, shall not be disclosed, is submitted to the court in this case upon certain interrogatories propounded to his excellency, Governor Thomas, after argument by counsel. The general rule is not denied, and indeed stands upon such firm grounds of public policy, and is so well fortified by authority, that it would be impossible to contest it.

Upon every such communication made by a party to his counsel, attorney or solicitor, the seal of the law is placed, and remains forever, unless removed by the party himself for whose protection the rule was established. But although the rule is thus inflexible in the cases to which it applies, there are, what are sometimes called exceptions to it, though these exceptions are rather apparent than real, and will, I think, be found upon

examination to be entirely without the principle upon which the rule rests. That is, they will be found, not to be communications from the client to the legal adviser at all, but information which the latter has acquired, independently of any such communication. And where that is the case, the interest of justice, so far from requiring that it shall be locked up in the breast of the attorney, demand its publicity, when necessary to guard, or to assert the rights of third persons.

These views of the law upon this subject, are sustained by the passages referred to in *Greenleaf on Evidence, from section* 237 *to* 245, and, in my opinion, rendered it perfectly proper that the witnesses should refuse to disclose the communications made to him by Mrs. Gibson, and which are called for by the fourth interrogatory, on the part of Edward Lloyd and others. Those portions of said interrogatory, which call for the provisions of the will, the reasons assigned by the testatrix therefor, and the conversations between her and the witness upon the subject, seem to me to fall clearly within the rule, and to be privileged communications, which must not be divulged ; the witness in his protest to the question stating, that all his conversation with her upon the subject was in relation to the will, in the drawing of which, he was acting as her attorney.

It appears to me, that if any thing was said in the course of that conversation, between Mrs. Gibson and the witness, they standing towards each other, in the matter then in hand, in the relation of legal adviser and client, which could if revealed by the witness, operate to her prejudice, the rule which prohibits such revelations, applies to it with stringent force. If there is any occasion upon which the secrets of the client should be safe when entrusted to his professional adviser, it must be when the client is making the final disposition of his worldly affairs, when, if ever, he must be suffered to make the most unreserved disclosures.

I think, therefore, that the witness was not at liberty to give the information called for in the defendant's fourth interrogatory in regard to the provisions of the will of Mrs. Gibson, the reasons for such provisions, and the conversation that took

22

place upon the subject, these communications having been made to him as her attorney.

The information asked for in the fifth question, I think, should be given, because it is such information as any other person, if present, would have acquired as well as the witness. In other words, it has no necessary connection with the character in which alone communications between parties are protected. The inquiry is, whether there were other persons present at the time the conversation took place, and whether there was any thing in the conversation not designed to be heard by those present. Now, whether there were or were not persons present, it is a fact of which any one else, if present, would have been equally conversant with the witness. His knowledge of the presence of such persons, had nothing to do with his professional character, being acquired by the use of natural faculties possessed by himself in common with other men. Such information cannot, I think, be considered as of that description of which the policy of the law forbids a witness to speak. It cannot be regarded, in any sense, as a professional communication upon which, alone, the law places the injunction of secrecy ; and, as it seems to me, the disclosure of it by the witness is clearly warranted by what are called the apparent exceptions to the rule, to be found in *Greenleaf*, sec. 244.

For the same reason, I see no ground upon which the witness can refuse to answer the seventh and eighth questions of the same parties. They ask for information which has nothing to do with his professional character, and which he did not acquire by reason of the confidence which was reposed in him on account of that character, and the relation he bore to Mrs. Gibson. He may and must tell every thing pertinent to the cause, which was not communicated to him as the legal adviser of Mrs. Gibson. Whether other persons were present at the time, or have spoken of what transpired or was said upon that occasion, are facts not communicated to him as her legal adviser, and, I think, cannot be withheld.

The next point relates to the mode in which the question is presented. It was presented in accordance with the practice,

as approved by the late Chancellor in *Winder* vs. *Diffenderffer*, 2 *Bland*, 194; and as was sanctioned by Lord Hardwicke, in *Valiant* vs. *Dodemead*, 2 *Atk.*, 524.

I am not, therefore, disposed to disturb it.   It has been said, that the privilege of not disclosing these confidential communications, being the client's privilege, if he is silent, the witness has not a right to make the objection.   That the silence of the client, when the question is propounded, is an implied waiver of the objection.

In answer to this, it may be said, and I think well said, that when the witness makes the objection to the question, he must be understood as making it in behalf of the client, and not on his own behalf; and, therefore, when the witness declines answering the question upon the ground referred to, and the client or the party representing him stands by and does not release the witness from the obligation not to reveal the information, he must be understood to approve the objection, and to insist upon his privilege.

It is therefore ordered, that the demurrer of the witness to the fourth interrogatory propounded to him on the part of Edward Lloyd and others, be ruled good, and that the witness shall not be required to answer that interrogatory.   But it is further ordered, that the demurrers of the same witness to the 5th, 7th and 8th questions of the parties be overruled, and that the witness be required to answer those questions.

---

[Other proceedings were then had, and several exceptions to the testimony were taken by both parties, none of which it is deemed material to state, and the cause set down for final hearing at the December term, 1848, when, after argument by counsel, the Chancellor delivered the following opinion :]

---

THE CHANCELLOR:

The late Jacob Gibson, by his will, executed on the 29th of November, 1817, and proved on the 13th of January, 1818, makes the following provision for his wife, Rebecca Gibson, in lieu of, and in full satisfaction for, her dower and thirds, in his real and personal estates :

"I give and bequeath unto my wife, Rebecca Gibson, for and during the time she may remain my widow, and no longer, the use, occupation and enjoyment of one moiety or half part of my dwelling house, or one-half part or moiety of the dwelling house bequeathed to my son, Fayette, which I purchased of the Hughes', and lying in Miles River Neck; and also, one-half of the use of the kitchen, garden and out-houses, belonging to either of the aforesaid farms, whichever she may choose, at any time, to live at during her widowhood aforesaid, any thing in this will to the contrary notwithstanding."

The will then directs Edward R. Gibson and Fayette Gibson, the sons of the testator, to furnish the widow with firewood. Bequeaths her some slaves for life, certain articles of furniture, horses, cows, the privilege of pasturage on the plantation upon which she may live, and the use of the stables and provender of all kinds. And then, after some other bequests to other persons, the will proceeds :

"I give and bequeath unto my wife, Rebecca Gibson, five hundred dollars, annually, whilst she remains my widow, to be paid to her by my two sons, Edward R. Gibson and Fayette Gibson, by them and their heirs jointly, two hundred and fifty dollars by each of them ; but, if she should marry, they are to pay her only one-half of that sum equally between them."

To his son, Edward R. Gibson, the testator had previously devised his dwelling plantation called "Marengo," and to his son Fayette, a part of the said tract called "Marengo," and a tract or parcel of land which the testator had purchased of Samuel and Daniel Hughes, and to his daughters he devised other portions of his real estate.

The widow elected to stand by this will, which was duly proved.

It appears by the proceedings in this case, and upon a bill filed in this court by James McCormick, junior, in January, 1824, that the personal estate of the testator, proving insufficient to pay his debts, a proceeding for the sale of the realty was instituted for that purpose, which resulted in a decree passed by the Court of Appeals, on the 9th of February, 1839, which affirming the decree of the Chancellor, directing a sale

of the realty in part, and reserving it in part, directed that the sale of the real estate thereby decreed to be made, should be subject to the rights of Rebecca Gibson, the widow of the deceased. The Court of Appeals, in their opinion said, "The decree of the Chancellor makes no reservation of the rights of the widow under the will of Jacob Gibson, but declares that the purchasers from the trustee, shall hold the property sold to them, free, clear and discharged from all claims of the parties to the cause, of whom Rebecca Gibson, the widow, is one. To conform to the act of assembly, the decree should have ordered the sales to be made by the trustee, subject to the devises made to Rebecca Gibson, by the last will and testament of the deceased. There is no intimation in the bill, or proof in the cause, that the provision made for the wife by the will, is fraudulent, in being greater than the value of her common law rights, and therefore unjust and injurious to creditors. She is therefore entitled to the benefit of all the bequests and devises made to her by the will, as a purchaser for a fair consideration."

The cause being remanded to this court, with power to pass such further decrees or orders as might be necessary to carry the decree of the appellate court into effect, and the cause being reinstated here, the trustee, on the 2d of April, 1839, reported his sales amounting to $15,639 36, which were finally ratified and confirmed on the 5th of June following.

It appeared by the opinion of the Court of Appeals in the case referred to, that injustice had been done to certain of the defendants therein named, to wit, Edward Lloyd, Harriet Bennet, and the heirs of John Wilson Blake, and it became necessary, when the cause came back, that accounts should be taken to ascertain how much the several parties interested, as devisees, or purchasers from the devisees of the testator, should contribute to the payment of his debts, according to the views expressed by the Court of Appeals. The president, directors, and company of the Farmers' Bank, were creditors of the testator to the amount of $13,720, secured by a mortgage on his estate called "Marengo," bearing date the 25th of May, 1813.

22*

And it appeared by the auditor's report of the 8th of March, 1841, that all the claims filed against the estate, except the claim of the bank, and of the complainant, were barred by limitations.

The trustee having sold only those portions of the estate called "Marengo," which were devised by the testator to his son Edward R. Gibson, and by him sold and conveyed to Fayette Gibson. And the portion of the same estate devised to Frances Gibson, then the wife of Dr. James Tilton, and the proceeds of these sales, not being sufficient to pay the mortgage debt of the bank, and the claim of the complainant, it became necessary to estimate the value of the other portions of the real estate of the testator, which were not sold, for the purpose of determining what proportion each should contribute, to make up the deficiency. This was done, and after various other proceedings, accounts based upon these principles, were stated, and finally confirmed.

The proceedings will show, that on the 18th of May, 1821, Fayette Gibson sold to John W. Blake, for a full price, that portion of the devise of his father to him, described as the land which the testator had purchased from Hughes, and which was called "Lombardy." That the mortgage which he took from Blake, to secure the balance of the purchase money, after deducting the cash payment, he transferred to one Harrison, by whose executor a bill was filed for the sale of the property to satisfy the debt, and that a decree passed in the year 1839, under which a sale was made in the same year, and that Orson Gore became the purchaser, and that this land is now owned by Charlotte L. Edmondson and Horatio L. Edmondson and James Hopkins, who claim by purchase from the said Gore, in the year 1843. It also appears, that in October, 1821, Fayette Gibson, for a full and valuable consideration, conveyed to Edward Lloyd, his part of the tract called "Marengo," with a general warranty of title, a covenant for further assurance, and that the grantor had full power to convey a title free of incumbrances; and that Lloyd and his devisee, one of the defendants, has held this property, without interruption, until the present bill was filed.

It further appears, that in January, 1822, Edward R. Gibson sold and conveyed to Fayette Gibson, the portion of "Marengo," devised to him, Edward, by the said testator, for the sum of $22,340, and that to secure the payment of $9000, part of the said purchase money, Fayette executed to the vendor a mortgage of the same property the day following.

At the sale made by the trustee in McCormick's case, before mentioned, the bank become the purchaser of that part of "Marengo" which had been devised to Edward R. Gibson, containing five hundred and twenty-five acres, at twenty dollars per acre, and one Charles Wright became the purchaser of that part of the same tract which was devised to Frances Gibson, the present Mrs. Tilton, containing two hundred and odd acres, at twenty dollars and seventy-five cents per acre.

The bank, subsequently, in July, 1839, sold a portion of the land purchased by it at the trustee's sale, to Kennedy R. Owen, for the sum of $7,723 47, of which there remained due, the sum of $6,853 14, on the 25th of September, 1846, with interest from that day.    It was in evidence, that on the day after the bank purchased as aforesaid, it rented the land to Fayette Gibson, at a rent equivalent to the interest on the whole amount then due on the mortgage, which was $13,739 55, of which Gibson paid the two quarters rent, ending on the 28th September, 1839; since which time he has paid nothing, though he continued in the possession and enjoyment of the property constantly, until the day of his death, early in the present year. The bill in this case was filed by Mrs. Rebecca Gibson, on the 10th of June, 1846, and upon the allegation that the annuity bequeathed to her by the testator, was a charge upon the lands devised to Edward R. and Fayette Gibson, the parties by whom it was to be paid, prays that said lands may be decreed to be sold, subject to her habitation rights, and privileges connected therewith, for the payment thereof, with all arrearages that have accrued thereon, with interest, and that the residue of the proceeds of sale may be set apart and invested, to secure the payment of the said annuity for the future.

The bill alleges, that the complainant, by surrendering her

legal rights as widow, and standing by the provision made for her by the will of her husband, became a purchaser of said provision with a fair consideration, and that she hoped that it would have been paid, but, that said Fayette and Edward Gibson failed or neglected to pay the same, while they owned and occupied said real estate, and that the several purchasers, and owners thereof, have since refused to pay the same, pretending that said land was not bound therefor, &c.

The parties to the bill are Fayette Gibson, and those who now hold, or are interested in the lands supposed to be charged with the annuity ; the other devisees of Jacob Gibson not being made parties.

Various defences are set up by the answers, the first of which is, that the annuity was no charge upon the land, but a mere personal obligation upon the devisees, Edward R. and Fayette Gibson, and there can be no doubt, that though the land may be charged, the devisees are personally responsible also. *West* vs. *Briscoe,* 6 *Harr. & Johns.,* 460.

Assuming, however, that this annuity was also a charge upon the land, and perhaps since the case of *Severson* vs. *Crawford,* decided by the Court of Appeals at December term, 1847, it would be difficult to maintain the contrary, the question still remains, whether, at this late period, and under the circumstances of this case, a Court of Equity will lend its aid to enforce it against the parties from whom the recovery is now sought. It may, however, not be unworthy of remark, that this being an annuity of uncertain duration, there may be reasons which might influence the court not to treat it as a charge, which would not apply to a legacy or other claim which could be at once paid off.

The answers rely upon limitations, lapse of time, and that the defendants who now hold the property are *bona fide* purchasers, for valuable consideration, without notice.

With regard to the defence of limitations it is said, that this annuity being in lieu of dower at law, is, like the claim of dower, exempt from the statute, and I am not prepared to say the position is not a sound one, though so far as these defend-

ants are concerned, the consequences are somewhat oppressive; because the whole weight of the accumulated claim would fall upon them alone, whilst if the claim to dower was asserted, all the devisees of the testator would be required to contribute in proportion to the value of their several devisees.

But assuming that limitations do not constitute a bar to the claim, the question remains, whether the complainant has not by her *laches* and the long period she has suffered to elapse from the time her right accrued, to the period of filing her bill, and the rights which, under her own eyes, have been acquired by other and innocent parties, unquestionably in ignorance in point of fact, of the nature and extent of the large demand now advanced by her.

The question, I say, is, whether under these circumstances, she can call to her aid the active powers of this court to enforce this demand.

The right of the complainant to the annuity commenced as far back as 1818, and although she charges in her bill, that Edward R. and Fayette Gibson failed and neglected to pay it, and that the purchasers and owners of the lands bound for it, have refused to pay the same, insisting that the lands were not liable, and although some of these purchasers acquired their titles as early as the year 1821, yet it is not until the year 1846, twenty-eight years from the accrual of her title, and twenty-five years from the date of the purchases referred to, that she invokes the aid of the court in her behalf. In the mean time, both Edward and Fayette Gibson, who sold portions of this property, and covenanted to convey unincumbered titles, have died insolvent, so that the purchasers, if compelled now to pay this claim, would be wholly without redress upon their covenants, and this, because of the delay on the part of the complainant in bringing forward her claim at an earlier period.

It seems to be admitted, and indeed the evidence very clearly establishes the fact, that Mrs. Gibson, if her sons had lived, and continued the owners of this property, never would have set up this claim; and it appears by her will, filed in this case, that whatever may be recovered, is to be enjoyed by the infant

children of her deceased son Fayette Gibson.   The claim, then, though the lands, some of them as early as the year 1821, have passed into other hands, was permitted to accumulate against them, the holders unquestionably unconscious of the demand, until the sum now, if enforced to the whole extent set up, would probably sweep them entirely away.

There is another circumstance which strikes me as entitled to serious consideration.   After the case of McCormick and Gibson was remanded to this court in 1839, proceedings, as we have seen, were had here, for the purpose of ascertaining how much the respective devisees of Jacob Gibson should contribute for the purpose of making up the sum required to pay his debts, and to this end, it became necessary to put an estimated value upon the several portions of his estate.   This was done, and in estimating the value of those portions which are now supposed to be charged with this annuity, with its accumulations, no allowance was made therefor, when undeniably, if the claim had then been supposed to exist, or had been asserted, it must essentially have reduced their value, and of course have diminished the amount which the owners of those lands should have contributed.

Mrs. Gibson was a party to that suit, and I cannot help thinking her appeal now to this court for assistance, is weakened by her neglect then to make known this claim.   The effect of her silence at that time, when all the devisees of her husband were before the court, is to throw upon these respondents the burden of her claim, although the contribution then exacted from them, was adjusted upon the hypothesis that no such claim existed.   It is not meant to be intimated, that Mrs. Gibson kept back her claim upon that occasion with any such view, because I am persuaded that at that time, which was in the year 1841, she never meant to assert it in this form, and perhaps supposed it had no existence as a charge upon the land. But the question still remains, shall parties equally innocent with herself be prejudiced by her omission, from whatever cause, to assert her rights at the proper time.

The evidence shows that Mrs. Gibson lived for the greater

part of her life, after the death of her husband, with her son Fayette, and that her wants, whatever they were, were supplied by him, and there would now, at this late period, be great difficulty, even if it were at all practicable, to adjust and settle the account in a fair and equitable manner.   And in addition to this, the enforcement of this claim, at this time, and against these parties, all of whom, except the bank, purchased unquestionably in ignorance in fact of the claim now set up, would be productive as to them, of manifest injustice; and this the result of the failure or neglect of the complainant to press her claim at an earlier period.   The circumstances of this case, I am persuaded, are sufficient to outweigh the equity of the complainant, strong as that equity would be under a different state of facts, to the favorable consideration of the court.

The doctrine established by the Supreme Court of the United States, in *Bowman et al.* vs. *Wothen et al.*, 1 *Howard*, 189, seems to me conclusive upon the subject, with reference at least to Lloyd, the Edmondsons and Hopkins.   Adopting the doctrine laid down by Lord Campden, in *Smith* vs. *Clay*, 3 *Brown's Ch. Rep.*, that court says, "that a court of equity which never is active in relief against conscience, or public convenience, has always refused its aid to stale demands, where the party has slept upon his for a great length of time; and that nothing can call forth this court into activity, but conscience, good faith, and reasonable diligence."

I do not think the complainant, with reference, at all events, to these defendants, has proceeded with reasonable diligence. She has suffered twenty-five years to elapse since their adverse title commenced, within which period the parties, liable over to them upon their covenants, have become insolvent; and if her claim can now be successfully asserted against them, they will be exposed to heavy and irremediable loss by her neglect.

It would seem, from a part of these proceedings, that the complainant herself had some scruple about pressing her claim against the Edmondsons and Lloyd; but, it is thought the same considerations which should induce liberality in the settlement

with them, are not at all applicable to the bank, and that with regard to the bank, it may be pressed with unmitigated severity. The circumstances which should expose the bank to this unfavorable discrimination in the view of a court of equity, are not apparent to me. Its claim was against Jacob Gibson, the testator, for money loaned him. Lloyd and the Edmondsons claim, by purchase, from one of the devisees of the testator, and it would be a little remarkable, if their title should be more respected than the title of the bank, claiming under the testator himself. Certainly, unless the bank has done something to forfeit the vantage ground upon which it stood, as the creditor of Jacob Gibson, its title would be stronger than the title of those who claim under him. The bank lost a part of its debt, by releasing that portion of the mortgaged premises purchased by Lloyd, from the operation of the mortgage, but this was prejudicial to no other party but itself, and is, of course, no ground of complaint against it.

But, although the bank was unquestionably entitled to have its debt paid, by a sale of the mortgaged premises, as the Court of Appeals have decided, yet, if the pretensions of the complainant are established, to the extent to which they are now advanced, nearly every thing which they have received for their debt, will be taken away. And why should this be so? because, as is argued, they purchased with full notice of the claim of the complainant. It is certainly true, that the bank did purchase with notice that it was buying, subject to the devises made to the complainant, but, that it purchased with notice, or even with the suspicion, that such a claim as is now set up, existed, it is impossible to believe. The Court of Appeals, it would seem, had, *ex industria*, omitted to define the rights of the complainant, though it asserted that she had rights, and declared the sale must be made subject to them; and it is quite probable, not to say certain, that the only rights which, it was supposed, the complainant had upon this property, at the time of the sale to the bank, was the right of habitation.

The bank purchased this property in 1839, ever since which time, as before, Fayette Gibson has lived upon and enjoyed

the use of it, paying them but two quarters' rent. The complainant lived with him, and was supported upon the property, and now, after omitting to press this claim for twenty-eight years, it is said, this same property, as the property of the bank, is liable for the annuity *ab initio*. I cannot think so. Fayette Gibson and his mother, the complainant, have actually, and in truth, enjoyed the fruits of the estate almost to the present time, and to suffer the security of the bank to be swept from it, by arrears which accumulated during that period, is inconsistent with my notions of justice, and, as I think, would be in conflict with the principles of the case in 1 Howard, before referred to.

If claims which have slept for upwards of twenty years can be thus revived, when the estate upon which they are supposed to rest has passed into other hands, the title to property would never be secure, and that confusion, so much deprecated by Lord Redesdale, in *Hovenden* vs. *Lord Annesley*, 2 *Sch. and Lef.*, 636, would constantly arise. I am strongly impressed with the conviction, that the complainant in this case has neglected, for an unreasonable length of time, to assert her claim, and if so, she has no title to call for the active interposition of a court of equity in her favor. It was said by Chief Justice Marshall, in *Elenendorf* vs. *Taylor*, 10 *Wheaton*, 152, that "from the earliest ages, courts of equity have refused their aid to those who have neglected for an unreasonable length of time to assert their claims, especially, where the legal estate has been transferred to purchasers without notice."

In the case of *Piatt* vs. *Vattier et al.*, 9 *Peters*, 405, it is said, in the language of Lord Redesdale, to be "the law of courts of equity that it will not entertain stale demands."

There is another view of this case, so far as it is proposed to charge the property purchased by the bank with the payment of this annuity, which seems to me to present an obstacle not easily surmounted. Jacob Gibson had mortgaged his "Marengo" estate to the bank, to secure the payment of the sum of $13,720 due from him, for money borrowed, and he, by his will, charged the devisees of this same estate, with the payment

of the annuity in question, to his widow, the complainant, which, it is contended, and perhaps under a different state of circumstances, it might properly be contended, would create a charge upon the land devised. There can be no doubt, that a widow, with respect to a devise made to her in lieu of her dower, is to be considered as a purchaser with a fair consideration ; but if the provision made for the wife by the will is fraudulent, in being greater than the value of her common law rights, and therefore unjust and injurious to creditors—to the extent of such excess, her title would not prevail against the claims of creditors. *Gibson et al.* vs. *McCormick,* 10 *Gill and Johnson,* 113, 114.

In this case, it is not understood, that the provision for the widow exceeds her common law rights, and is, therefore, unjust to the body of the creditors of the testator; but the question is, whether, after having in his lifetime given to one of his creditors a mortgage on a particular portion of his estate, to secure the claim of that creditor, he can afterwards take that security from him, by charging the same part of his estate with the provision for his wife, even though the provision, in view of his whole estate, does not exceed her common law rights?

"Marengo" is the estate upon which the testator gave a mortgage, to secure the debt due from him to the bank, but he afterwards, by his will, charges this same estate with the provisions for his widow, and by this charge, if the complainant is successful in his pretensions, the security to the bank is most effectually destroyed, and this without necessity, as it is manifest the testator owned other estates, out of which the proper provision for his wife could have been made. It seems to me impossible such a doctrine can be established; for if so, it would place creditors who have obtained security from their debtors, frequently, entirely at their mercy. The utmost that the wife could claim under such circumstances, would be to the extent of her dower interest in the particular land mortgaged, and the husband could not be allowed, by throwing his wife's dower entirely upon it, to wrest from his creditors a security which he had fairly given him. The widow, for the

amount of the provision beyond her dower interest in that particular piece of property, must be regarded as a volunteer, and her claim for such excess, subordinate to the claim of the creditor.

The bill in this case, therefore, will be dismissed.

CORNELIUS McLEAN for Complainants.
A. RANDALL and JAMES MURRAY for Defendants.

[This decree was affirmed on appeal.]